# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| LATIN MANAGEMENT ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:22-cv-00523** |
| | ) | **Judge Aleta A. Trauger** |
| LA COSTA NAYARITA, INC. and OSWALDO OMAR MEDINA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiff Latin Management Enterprises, LLC ("LME") has filed a Partial Motion for Summary Judgment (Doc. No. 34), to which defendants La Costa Nayarita, Inc. ("LCNI") and Oswaldo Omar Medina have filed a Response (Doc. No. 41), LME has filed a Reply (Doc. No. 46), and Medina and LCNI have filed a Sur-Reply (Doc. No. 53). LME has also filed a Motion in Limine No. 1 (Doc. No. 48), to which LCNI and Medina have filed a Response (Doc. No. 51), and LME has filed a Reply (Doc. No. 54). For the reasons set out herein, the Motion for Summary Judgment will be largely denied, but will be granted with regard to one defense, and the Motion in Limine will be granted in part and denied in part.

## I. BACKGROUND

### A. LME's Marks

LME operates multiple restaurants in the Atlanta, Georgia area. (Doc. No. 47 ¶ 39.) One of those restaurants operates under the name "Las Costas Nayaritas" and specializes in "Mexican-style seafood." (*Id.* ¶ 43.) On October 23, 2018, a company affiliated with LME filed applications with the U.S. Patent & Trademark Office ("USPTO") for two trademarks related to that restaurant:

1

a word mark, without claim to any particular font or style, of LAS COSTAS NAYARITAS; and a word/design mark for a logo including the words LAS COSTAS NAYARITAS MEXICAN SEAFOOD BAR & GRILL. (*Id.* ¶ 1; *see* Doc. No. 42-1.)

On February 9, 2019, the USPTO responded with an Office Action requiring a response to the objection, raised by the application's USPTO examining attorney, that the marks were geographically descriptive. (Doc. No. 47 ¶ 3; *see* Doc. No. 42-2.) As the Office Action explained— and as no party to this litigation disputes—Nayarit is a Mexican state that abuts the Pacific Ocean, meaning that the phrase "las costas Nayaritas" translates to "the coasts of Nayarit," an actually existing place. (*See* Doc. No. 42-2 at 4.)

On July 15, 2019, LME's then-attorney, Parsa Garrett, filed a Response to Office Action. (Doc. No. 47 ¶ 7; *see* Doc. No. 42-3.) Garrett argued that the marks were not geographically descriptive because none of LME's services were "rendered in," or had any actual "connection with," Nayarit. (Doc. No. 42-3 at 5.) Garrett also disputed whether the relevant consumers would be familiar with Nayarit, noting that it "is one of Mexico's least populous states, with a population of 1,084,979 people according to a 2010 census." (*Id.* at 6.) Garrett asserted that LME "operates a Mexican seafood restaurant that caters to all average American customers" and that, "[t]o [the applicant's] knowledge, the majority of its guests are not even of Hispanic or Latin descent" and would be unlikely to be "familiar with the coasts of Nayarit." (*Id.*; Doc. No. 47 ¶ 14.) Garrett also stated that the restaurant "does not claim in any of its advertising, and has never claimed, to the general public that its food originates from or is based upon the food located in the coasts of Nayarit." (Doc. No. 42-3 at 5.)

The defendants suggest that Garrett's response misrepresented the restaurant's marketing strategy and customer base in order to create a false impression regarding how likely its customers

were to recognize the name of a Mexican state. LME now concedes that it chose to open Las Costas Nayaritas because it had recognized a "niche that needed to be filled" in the "Hispanic market of Northern Atlanta, Georgia." (Doc. No. 47 ¶ 43.) Indeed, LME specifically did market research focused on "Hispanic" customers in the relevant geographic area, and it hired chefs to develop a menu that, in the words of LME's Rule 30(b)(6) witness, "would cater to the taste buds of the Hispanic culture." (*Id.* ¶ 45; Doc. No. 42-10 at 30.) When the witness was pressed regarding what he meant when he referred to the "Hispanic" market, he acknowledged that he was referring, at least in significant part, to customers who were from, or had ties to, Mexico. (Doc. No. 42-10 at 29–30.) The restaurant's social media marketing also uses Spanish, at least some of the time. (Doc. No. 47 ¶ 47.)

The defendants also suggest that LME improperly downplayed the importance of the state of Nayarit, in particular, for its marketing. The defendants claim that "[t]he food of Nayarit, Mexico has a distinctive style" and that an ordinary customer familiar with Mexican regional cuisines would understand a U.S.-based restaurant called "Las Costas Nayaritas" to feature such food. (*Id.* ¶ 52.)

The USPTO, however, was not informed of any of those facts, and, on November 19, 2019, it granted LME registration of the marks on the principal register. (*Id.* ¶ 17.) The affiliated company that filed the applications assigned its rights to LME a few months later. (*Id.* ¶¶ 18–19.)

**B. This Dispute**

LCNI, which is owned and operated by Medina and his wife Jackie Onate, has a restaurant in Antioch, Tennessee, a part of the Nashville metropolitan area. (*Id.* ¶ 21.) Until around 2017, that restaurant did business under the name "Camino Real." (Doc. No. 42 ¶ 4.) Camino Real, however, struggled to produce enough business, which led Medina to overhaul the restaurant's name and

overall concept. In its new form, the restaurant specialized in Mexican seafood and operated under the name "La Costa Nayarita"—that is, a singular version of "Las Costas Nayaritas." (*Id.* ¶¶ 9–10)

LME claims that the similar name is no coincidence, and there is some evidence of that. It is undisputed that Medina and Onate have visited the original Las Costas Nayaritas restaurant near Atlanta, although the parties disagree about whether Medina and Onate did so before their own restaurant's rebranding to a similar name. It is also undisputed that LCNI approached a former LME chef, Mercedes Gonzales, to purchase recipes for the rebranded restaurant and that LCNI ultimately hired Gonzales as head chef of the Nashville-area restaurant. (*Id.* ¶¶ 1–2, 5–8.) However, Onate, who testified as LCNI's Rule 30(b)(6) witness, said that she and Medina selected the name "La Costa Nayarita" because they wanted "something beachy," and the food would be "Nayarita style." (Doc. No. 47 ¶ 64.) She said that they also considered the names "Mariscos Nayarit" and "Marisceria Nayarit." (*Id.* ¶ 65.) Onate testified that LCNI purchased recipes from Gonzales in order to provide what she characterizes as Nayerit-style Mexican seafood, not to recreate LME's specific, preexisting restaurant in another city. (*Id.* ¶ 66.)

Sometime in 2018, LME became aware that LCNI was operating a restaurant in Tennessee under the "La Costa Nayarita" name. (*Id.* ¶ 67.) There is some evidence that individual customers may have been confused about whether the restaurants were connected. LME's owner and Rule 30(b)(6) witness testified that he had personal knowledge of four times in which individuals calling the Atlanta restaurant appeared to believe that it was connected to the Nashville restaurant and that he had heard of "a couple" or "a few" other instances that the same had happened to other employees. (*Id.* ¶¶ 56–57.) LME seeks to introduce evidence of other such calls, but LCNI disputes the admissibility of that evidence. (Doc. No. 42 ¶ 11.) LCNI concedes, however, that some "[c]onsumers have mistakenly tagged [LME's] restaurant on social media, thinking that it was"

4

LCNI's. (*Id.* ¶ 12.) Both restaurants advertise on Spanish-language radio, although, as one would imagine, their advertisements are focused on their respective metropolitan areas. (*Id.* ¶ 13.)

On June 9, 2020, Garrett sent a cease-and-desist letter, accusing LCNI of "intentionally violating" LME's rights and demanding that LCNI take the following actions by August 1, 2020:

1. Cease and desist from all further use of the Marks and any other designations likely to cause confusion with or dilution of Latin Management Enterprises' Marks; including removal of any and all logos making reference to "La Costa Nayarita" or "Las Costas Nayaritas" from your menus, business cards, gift cards, brochures, website, marketing materials, social media sites, and advertising sites, and any other uses of "Las Costa Nayarita" or "Las Costas Nayaritas";

2. Destroy any other materials in its possession or control bearing any designation likely to cause confusion with or dilution of Latin Management Enterprises' Marks;

3. Dissolve or change the name of any registered business which make[s] use of the Marks or any other designations likely to cause confusion with or dilution of Latin Management Enterprises' Marks (including the registration of La Costa Nayarita, Inc. with the Tennessee Secretary of State); and

4. Provide written confirmation that La Costa Nayarita will comply with these demands which can be accomplished by signing below and returning to our office.

(Doc. No. 42-14 at 3–4.)

On July 30, 2020, counsel for LCNI, Julian Bibb, sent Garrett a response that did not admit liability but that did indicate a willingness to change the name of the Tennessee restaurant:

Without addressing the substance of your claims, and without otherwise denying or admitting to any of the allegations you have set forth in your letter, our client has determined that it would prefer to change the name of its restaurant and avoid incurring any unnecessary legal costs or expenses associated with engaging in legal arguments with Latin Management. Therefore, our client intends to cease using LA COSTA NAYARITA and instead adopt and use the phrase, "LA COSTA MEXICAN SEAFOOD GRILL AND BAR," as a replacement name. Our client anticipates that it will need at least nine (9) months to complete the rebranding process associated with changing all references in its signage, menus, advertising and marketing materials, social media sites, website, and the like.

We trust that this response fully satisfies your client's concerns. Should you have any questions or further comments, you may direct your further correspondence on this matter to my attention.

(Doc. No. 42-15 at 2.)

A few days later, Garrett emailed Bibb a response. Garrett wrote:

Thanks for your letter. We appreciate your client's receptiveness and response. Rest assured, my objective is and always has been to resolve this matter amicably, and I'm grateful (on behalf of myself and my client) that we are progressing in that direction.

We appreciate that rebranding does take time, and my client does not expect that it will happen overnight.

Candidly, my client does feel that 9 months is a bit long, while something along the lines of 6 months would be a bit more reasonable from their perspective. I've found it particularly helpful to agree on some milestones/timeframes for certain items for the sake of transparency and open communication, perhaps in the form of [a] settlement agreement or letter of understanding of some sort? I think this can go a long way to ensure that my client keeps faith in the process and can avoid anything evolving into a bigger dispute.

Let me know if your client would be open to working something like that out and if they take any issue with the above.

(Doc. No. 42-16 at 5.) Bibb did not immediately respond to Garrett's proposal. (Doc. No. 47 ¶ 71.)

However, on October 9, 2020, Bibb sent Garrett an email including a "new logo representing the new name described in my response letter from late July." (Doc. No. 42-16 at 4.) Bibb also stated that LCNI was "currently working on a new menu design to replace the old name/logo with this new one." (*Id.*) Garrett did not immediately respond, and Bibb eventually sent a follow-up email on November 5, 2020. Garrett responded that he would speak to his client and follow up, and, on November 6, 2020, Garrett wrote:

Hey Julian:

The logo is acceptable.

Best,

6

Parsa

(*Id.* at 2.) Garrett did not address any other aspect of the parties' dispute or dealings. (*Id.*) According to LCNI, that response left it with the impression that the matter was resolved. (Doc. No. 47 ¶ 73.)

The parties agree that, "by January 28, 2021, [LCNI] changed their website, social-media handles, outdoor sign, and interior banner from 'La Costa Nayarita' to 'La Costa Mexican Seafood,'" a process that "cost many thousands of dollars to complete." (*Id.* ¶¶ 74–75.) However, LCNI initially failed to remove a painted greeting above the door in its vestibule, which read:

BIENVENIDOS

La Costa Nayarita

(*Id.* ¶ 76; Doc. No. 42-20.) In October 2021, LME sent a cease-and-desist letter complaining of the vestibule, and LCNI promptly painted over the offending language. (Doc. No. 47 ¶ 76; *see* Doc. No. 42-21.)

As the cease-and-desist letter made clear, however, LME's complaints were not exclusively—or even primarily—about LCNI's already-abandoned "Las Costa Nayarita" name. The letter accused LCNI of offering "several . . . food menu items [that] are identical" to those offered by LME and of improperly replicating not only LME's "branding," but also its "design . . . and aesthetic." (Doc. No. 42-21 at 3.)

On July 12, 2022, LME filed its Complaint against LCNI and Medina. The Complaint asserts claims under the Defend Trade Secrets Act, the Lanham Act, and the Tennessee Consumer Protection Act ("TCPA"). (Doc. No. 1 ¶ 22.) LME now seeks summary judgment as to liability on its Lanham Act and TCPA claims, as well as some potential affirmative defenses by LCNI. (Doc. No. 34.) LCNI has not filed a cross-motion for summary judgment, but, in its Response to LME's

7

motion, LCNI asks the court to "grant summary judgment to [LCNI] *sua sponte* pursuant to Federal Rule of Civil Procedure 56(f), and order cancellation of [the registration of LME's] Mark pursuant to 15 U.S.C. §§ 1064 and 1119." (Doc. No. 41 at 25–26.) LME has also filed a Motion in Limine asking the court to exclude "any testimony of Jackie Onate regarding what 'most Hispanics' would understand and the style of food served in Nayarit, Mexico." (Doc. No. 48 at 1.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003.) The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. *Id.*

Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims. Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. *Prima Facie* Trademark Infringement

The elements of a claim for trademark infringement under the Lanham Act are: (1) the plaintiff's ownership of the rights to a valid trademark; (2) the defendant's use of the mark or a similar mark in commerce; and (3) a likelihood that the defendant's use would cause confusion. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009); *see also* 15 U.S.C. § 1114(1). There is no reasonable basis for disputing the fact that "Las Costas Nayaritas" and "La Costa Nayarita" are highly similar names or that LCNI used "La Costa Nayarita" as a trade name in commerce. LME's ability to establish a *prima facie* case of trademark infringement, therefore, depends on whether the undisputed evidence would require a finder of fact to adopt LME's position regarding the other two elements: the validity of its trademark rights and the likelihood of confusion.

#### 1. Validity of Mark

"Once registered, a mark becomes presumptively valid, placing the burden of proof and production on anyone challenging the mark." *Ausable River Trading Post, LLC v. Dovetail Sols.*, Inc., 902 F.3d 567, 570 (6th Cir. 2018) (citing *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S.

9

205, 209 (2000); *Fuji Kogyo Co. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006)). The strength of that presumption, however, depends on how long the registration has remained on the books without a successful (or pending) challenge. If, after five years, a mark is still registered and in use, and there are no pending proceedings contesting its validity, the mark's registration becomes what is referred to, in the Lanham Act, as "incontestable"—meaning that many grounds for potential cancellation of the registration are no longer potentially applicable. *See* 15 U.S.C. § 1065. "Incontestable," however, is something of a misnomer, because even an "incontestable" registration may still be cancelled "[a]t any time if the registered mark becomes the generic name for the goods or services, or a portion thereof, for which it is registered, or is functional, or has been abandoned, or its registration was obtained fraudulently." 15 U.S.C. § 1064(3). In any event, this lawsuit began fewer than five years after LME's registration was granted, meaning that LME enjoys only a rebuttable presumption of the validity of its mark, and the registration from which it draws that presumption is still vulnerable to cancellation for an array of reasons.

In order to be a protectable trademark, a mark must be capable of signaling the origin of a good or service, and, in order to do that, the mark "must be distinctive." *Papa Ads, LLC v. Gatehouse Media, Inc.*, 485 F. App'x 53, 55 (6th Cir. 2012) (citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002)). Distinctiveness of a mark, broadly speaking, comes in two forms: inherent and acquired. A mark is inherently distinctive if it is not actually "descriptive of [the] product" being offered for sale, such that its use with that product would be readily apparent as a brand name or other indication of source. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). A descriptive word or phrase, in contrast, could simply be referring to the product, not its source, and is, therefore, not inherently "distinctive" in the way that matters for trademark purposes. "However, descriptive marks may acquire the

distinctiveness which will allow them to be protected" if they become associated with a specific producer due to that producer's use of the mark in commerce. *Id.* (citing 15 U.S.C. §§ 1052(e), (f)). This acquired distinctiveness is also sometimes referred to as "secondary meaning." *Id.*

As the USPTO's initial response to LME's application for registration demonstrates, there are well-established obstacles to establishing distinctiveness with regard to a name that, like "Las Costas Nayaritas," simply describes an actual, existing place—particularly if that actually existing place has some connection with the product or service at issue. The parties disagree regarding the extent to which their restaurants' food can be tied specifically to the state of Nayarit, but it is undisputed that, if nothing else, each restaurant specializes in seafood prepared in a manner generally associated with the cuisine of Mexico. A trademark that simply consists of a description of a particular part of Mexico's coasts, therefore, potentially faces the same general challenges of protectability that geographic marks often do.[1]

LCNI argues that LME's LAS COSTAS NAYARITAS marks lack distinctiveness and that LME's registration of those marks was obtained by fraud—namely, by misleading the USPTO that LCNI's restaurant served a broad, generic customer base that was unlikely to be familiar with the state of Nayarit. One can argue that the LAS COSTAS NAYARITAS mark is more "suggestive" than descriptive, given that it refers to "the coasts of Nayarit" rather than "*food from* the coasts of Nayarit," but courts have been skeptical of such arguments "[w]here a logical connection can be

---

[1] LME suggests that LCNI has waived reliance on this issue because it did not plead "geographic descriptiveness" as an affirmative defense. LME, however, is required to demonstrate both the validity of its mark and likelihood of confusion as part of its *prima facie* case, and geographic descriptiveness is relevant to both of those inquiries. *See Universal Life Church Monastery Storehouse v. King*, No. 2:19-CV-301, 2023 WL 5333014, at *4 (W.D. Wash. Aug. 18, 2023) ("[The plaintiff] continuously refers to secondary meaning as an 'affirmative defense' that [the defendant] bears the burden of proving. This is incorrect. [The plaintiff] is required to establish secondary meaning of its mark for the Court to conclude it justifies trademark protection.").

made between the product and the geographical term." *Lamberti v. Positano Ristorante, Inc.*, No. CIV.A. 04-4485, 2005 WL 627975, at *4 (E.D. Pa. Mar. 16, 2005). That type of logical connection is plausibly apparent here, given that the restaurants at issue offer coastal Mexican food, and their names are "of a piece with the common practice of including within product names a geographic reference meant to describe the products themselves." *Id.* In any event, the mark is either (1) actually descriptive, in which case it requires acquired distinctiveness to be protectable at all, or (2) suggestive in a manner that is very close to being descriptive, in which case it requires acquired distinctiveness to be anything other than a quite weak mark.

There is some evidence that the LAS COSTAS NAYARITAS name has, in fact, amassed some acquired meaning, at least among diners in the Atlanta area. If nothing else, the restaurant has been actually advertising and actually serving customers. Beyond the bare facts that would be true of any restaurant that had successfully operated for at least a few years and had advertised to consumers, however, the evidence of commercial strength is close to nonexistent. The "most persuasive evidence" would be consumer surveys, but LME has produced none. *Kibler v. Hall*, 843 F.3d 1068, 1074 (6th Cir. 2016). There is, moreover, evidence that affirmatively undermines what limited commercial strength the marks may have, such as the fact that there are two locations of a restaurant using the mark MARISCOS LA RIVIERA NAYARIT within a few miles of LME's location. (*See* Doc. No. 47 ¶¶ 34–37.) "[P]roof that third parties have extensively used a trademark or similar trademarks in the relevant market may indicate that the trademark is commercially weak." *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 430 (6th Cir. 2017) (citing *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991)).

LME's registrations provide no help on the question of acquired distinctiveness/secondary meaning, because LME did not rely on those doctrines in obtaining the registrations, but rather its argument that its mark was inherently distinctive because the restaurant's customers were unlikely to know what Nayarit is. LCNI, moreover, has produced evidence sufficient to permit a jury to conclude that those representations were misleading. LME responds that neither its claim to serve "all average American customers" nor its assertion that it lacked specific knowledge that a majority of its customers were "of Hispanic or Latin descent" was literally false, and that may well be true. LME's obligation as an applicant for registration, however, was not simply to avoid statements that were actually false, but also "not to 'make . . . knowingly *misleading* statements' of a material fact. *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009) (quoting *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)) (emphasis altered). The question relevant to LME's registration application was not whether its clientele were "average American customers" in some abstract sense, but whether they possessed the average American's knowledge of the names of the states of Mexico. Similarly, what mattered was not whether the restaurant's customer base was 49% Hispanic, as opposed to 51% or some higher number, but whether a substantial portion of the customer base would be familiar with the geographic name "Nayarit." The only relevance of LME's statements to the trademark registration process was to give the impression that its customers would have no idea that "Nayarit" referred to a specific, existing place on Mexico's Pacific coast. A reasonable jury could certainly conclude that making those statements, while failing to disclose that the restaurant was purposely designed and marketed to customers with a direct connection to Mexico, was misleading. Any presumption of distinctiveness available due to the registration is, therefore, weak, if not wholly rebutted.

13

It is, of course, possible both that LME misled the USPTO and that it nevertheless possesses protectable rights in the LAS COSTAS NAYARITAS mark, based on distinctiveness created through the restaurant's actual use of that mark in commerce. At this stage, however, the court is only called on to determine whether a reasonable finder of fact would be compelled to reach that conclusion based on the undisputed evidence, and the limited evidence in the record of acquired distinctiveness is not so overwhelming as to take this issue out of the hands of a jury.

Moreover, as the court will discuss in greater detail in the next section, even if a reasonable jury would have no choice but to conclude that the LAS COSTAS NAYARITAS mark is entitled to *some* protection, it is plausible that that protection is both weak and quite narrow—given the facts that (1) the name is used only with a single restaurant in a single city, (2) LME has no right to prevent other businesses from making non-misleading, factual references to the actually existing state of Nayarit; and (3) LME has no plausible right to expect other seafood restaurants to avoid either the word "coast" or an equivalent. Even if one disagrees regarding whether a jury could find a complete lack of a valid trademark, the weakness of LME's rights is relevant to the likelihood of confusion analysis.

### 2. Likelihood of Confusion

In the Sixth Circuit, courts typically "weigh the following factors (sometimes called the *Frisch* factors) to determine whether a likelihood of confusion exists—(1) the strength of the senior mark, (2) the relatedness of the goods or services, (3) the similarity of the marks, (4) evidence of actual confusion, (5) the marketing channels used, (6) the likely degree of purchaser care, (7) the intent of the defendant in selecting the mark, and (8) the likelihood of expansion of the product lines." *Bliss Collection, LLC v. Latham Companies, LLC*, 82 F.4th 499, 509 (6th Cir. 2023) (discussing factors set out in *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville*, Inc., 670

F.2d 642, 648 (6th Cir. 1982)) (other citations omitted). Two of those factors—relatedness of goods and services and the similarity of the marks—plainly favor a finding of likelihood of confusion in this instance. Whether LME is entitled to summary judgment, therefore, depends on whether the other factors, taken together, either support those factors or complicate the picture in a way that would support sending the matter to a jury.

**Strength of the marks.** "[T]he strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength . . . ." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012). When courts evaluate conceptual strength, they typically do so in terms of five well-known "categories of generally increasing distinctiveness; following the classic formulation . . . , [a mark] may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos*, 505 U.S. at 768 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2nd Cir. 1976)). As the court has already held, LME's marks are plausibly descriptive, although an argument exists that they are suggestive. Either possibility, however, would mean that the marks' conceptual strength is low. *See FirstPower Grp. LLC v. WD-40 Co.*, No. 5:17-CV-392, 2017 WL 3034499, at *5 (N.D. Ohio July 18, 2017) ("Suggestive and descriptive marks are weak relative to arbitrary and fanciful marks, however, and confusion is less likely where weak marks are involved.") (collecting cases). The marks' claim to relative strength, therefore, depends on the distinctiveness that they acquired in commerce.

The evidence of the commercial strength of the LAS COSTAS NAYARITAS marks, however, is, as the court has already discussed, limited. Clearly, some people know that the Atlanta-area restaurant exists and is operated by a particular entity and/or individuals, but there is little, if any, evidence of commercial strength beyond that. The combination of low conceptual

15

strength and little demonstrated commercial strength means that a reasonable jury could conclude that LME's marks are among the weakest marks potentially entitled to protection—if they are entitled to that protection at all. This factor, therefore, weighs against a conclusion that LME is entitled to summary judgment.

**Actual Confusion.** There is some evidence of consumers experiencing confusion based on the parties' similar marks, although it is disputed how frequently such confusion occurred. That confusion, moreover, seems to have largely involved people either calling the wrong restaurant or tagging the wrong restaurant on social media, with little direct evidence that customers' confusion actually affected their dining choices. An errant phone call or social media tag is not, in and of itself, evidence that any consumer was misled or confused in a way that actually harmed LME or affected LME's reputation.

That does not make those errors immaterial; courts have recognized that so-called "initial-interest confusion" can still warrant Lanham Act protection "under the right circumstances." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 518 (6th Cir. 2013). The importance of that initial-interest confusion, however, is significantly undermined by the geographic distance between the parties' restaurants. The Sixth Circuit has explained the risk of initial-interest confusion in the context of food service as follows:

> Suppose that you are taking a long roadtrip, you have become very hungry, and you are keeping an eye out for a McDonald's, which is your fast-food restaurant of choice. Soon you spot a "McDonald's" sign by an exit. You take the exit and follow the signs, looking forward to your favorite McDonald's hamburger. But—behold—it's a Burger King. The signs were misleading. You are not so fond of Burger King but, having already made the detour and loath to waste even more time, you reluctantly buy a Whopper and get on with your trip.

*Id.* at 518 (citing *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999)). LME's restaurant, however, is not a chain. While it is possible that, from time to time,

someone who has spent time in the Atlanta area might have mistakenly believed that the then-similarly-named Nashville-area restaurant was affiliated with LME, the potential harms of initial interest confusion are far less with regard to these facts than they would be with regard to competing national chains or establishments located in the same metropolitan area. This factor, nevertheless, does provide some support for LME's position. Evidence of online confusion and confusion over the phone is, if nothing else, meaningful circumstantial evidence that other, harder-to-verify confusion is happening as well. *But see Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) (holding that social media tagging errors represented "instances of general mistake or inadvertence" that did not support a likelihood of confusion).

**Purchaser Care.** There is no evidence that the parties' customers' dining decisions involve a particularly high degree of care—as might be the case for a more expensive product or a product that the consumer wished to use for an extended period of time, not just for a meal. This factor, accordingly, is generally favorable to a finding of likelihood of confusion, as it would be in nearly any restaurant-based case.

**Overlap of Marketing Channels/Likelihood of Expansion.** LME points out that both restaurants advertise on Spanish-language radio and on the internet. The significance of that overlap, however, is significantly undermined by the fact that they do so in order to reach potential diners in completely different metropolitan areas that are well over 200 miles apart. *See Tailgate Beer, LLC v. Boulevard Brewing Co.*, No. 3:18-CV-00563, 2019 WL 5208186, at *8 (M.D. Tenn. Oct. 16, 2019) (Richardson, J.) ("[I]n order to appeal to a common customer, the parties must be located in or sell to buyers in the same geographic region.").

In some ways, the issue of expansion of product lines is not particularly relevant in this instance, because LME and LCNI already offer the same type of products. More relevant, however,

is the possibility of LME's geographic expansion—that is, the possibility that the two restaurants will ever be in competition for diners in the same metropolitan market. There is no evidence in the record that LME is likely to expand into the Nashville area, and, while restaurants do sometimes adopt a chain model, there is no reason to think that that is a particularly significant possibility here. These factors, accordingly, weigh against a finding of likelihood of confusion.

**Intent.** The defendants' intent in adopting their marks is disputed. For the purposes of summary judgment, the court must construe the evidence in the plausible manner that is most favorable to the defendants, which would lead the court to conclude that the defendants earnestly selected the name "La Costa Nayarita" because they wanted to convey that the restaurant offered seafood in a style that the defendants believed to be typical of Nayarit.

Moreover, even if one were to accept LME's version of events, it is not clear that the supposedly improper motives that LME ascribes to LCNI are actually problematic from a trademark perspective. The briefing and the evidence leave little doubt that one of LME's complaints—possibly its central complaint—is that LCNI stole its successful restaurant "concept." Trademark law, however, exists to protect goodwill, not ideas or business plans. Even if LCNI made a conscious, knowing decision to run the same type of restaurant as LME in order to enjoy success similar to LME's, it did not necessarily do anything wrong. Unless LCNI was intending to trade on LME's actual, particularized goodwill, then LCNI had no improper motive, for trademark infringement purposes. This factor, therefore, weighs significantly against granting summary judgment.

**Weighing of the Factors.** Based on the foregoing, LME has fallen far short of establishing that a reasonable jury would be compelled to find a likelihood of confusion. Such a jury could find that its marks are weak and that consumers are unlikely to be confused by the fact that two Mexican

18

restaurants in different states had similar geographically-inspired names. The court, accordingly, must deny LME's motion on the issue of Lanham Act liability.

## B. Tennessee Consumer Protection Act

The TCPA provides a private right of action to "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in [Tenn. Code Ann.] § 47-18-104(b) and declared to be unlawful by" the Act. Tenn. Code Ann. § 47-18-109(a)(1). "Person" is defined to include both natural persons and business entities. Tenn. Code Ann. § 47-18-103(14). The list of "unfair or deceptive acts or practices" prohibited by § 47-18-104(b) includes both broadly-worded general prohibitions and narrower, industry-specific prohibitions. Tenn. Code Ann. § 47-18-104(b)(1)–(52). Pursuant to those provisions, a plaintiff typically must prove two things to establish a claim under the TCPA: (1) that the defendant engaged in an act or practice that is among those prohibited by the Act; and (2) that the prohibited act or practice caused the plaintiff to suffer an ascertainable injury of the type covered by the Act. *Hanson v. J.C. Hobbs Co.*, No. W2011-02523-COA-R3CV, 2012 WL 5873582, at *9 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115–16 (Tenn. Ct. App. 2005)). For the purposes of the TCPA, "[a]n ascertainable loss is a deprivation, detriment, or injury that is capable of being discovered, observed, or established." *Discover Bank v. Morgan*, 363 S.W.3d 479, 495 (Tenn. 2012) (citing *State v. New Beginning Credit Ass'n, Inc.*, No. M1999-00461-COA-R3CV, 2006 WL 1472284, at *8 (Tenn. Ct. App. May 25, 2006).

To satisfy the first element of a TCPA claim—that the defendant committed a prohibited act—LME relies on Tenn. Code Ann. § 47-18-104(b)(2), which makes it unlawful to "caus[e]

19

likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." The TCPA claim, therefore, is largely a reiteration of the Lanham Act claim, and LME's request for summary judgment fails for the same reasons. It is, moreover, questionable that LME has suffered any ascertainable loss. Its request for summary judgment with regard to the TCPA will, therefore, be denied.

## C. Affirmative Defenses

LME argues that it is entitled to summary judgment with regard to five affirmative defenses set out in LCNI's First Amended Answer. The first three of those defenses—waiver, laches, and estoppel—potentially arise out of the fact that, after LME first contacted LCNI with its allegations of infringement, LCNI agreed to, and did, embark on an expensive process of rebranding at LME's request, only to be sued anyway. The other two defenses involve the extent to which LME has any right to police other parties' uses of the mark LA COSTA.

### 1. Waiver by Settlement

For the purposes of waiver, LCNI argues that LME and LCNI entered into a settlement agreement that, among other things, included a waiver of LME's claims. LME and LCNI's correspondence following LME's initial cease-and-desist letter did not result in any formal, express settlement agreement that was designated as such. LCNI nevertheless argues that such an agreement arose and that the agreement included a waiver of LME's right to sue LCNI regarding the underlying facts.

It is true that, if a settlement agreement had been reached, it likely would have included such a waiver. None of the evidence in the record, however, would support a finding that such an agreement was actually finalized. An implied contract will only arise "under circumstances which show mutual intent or assent to contract." *Givens v. Mullikin ex rel. Est. of McElwaney*, 75 S.W.3d

383, 407 (Tenn. 2002) (quoting *Angus v. City of Jackson*, 968 S.W.2d 804, 807 (Tenn. Ct. App. 1997)). A person who reviewed the parties' correspondence might reasonably assume that they were well on their way toward a settlement agreement, but nothing about the underlying circumstances suggests that they ever actually got there. Indeed, the correspondence expressly recognized that an actual settlement agreement was only a possibility, not a reality. Moreover, the correspondence does not reflect a resolution of key disputed points that such an agreement would contain.

For example, the initial cease-and-desist letter included demands regarding the timing of any rebrand to which LCNI objected and never assented. The cease-and-desist letter also included demands regarding LCNI's corporate name, and the parties never agreed to any terms on that issue either. One might argue that the parties reached something of a broad agreement regarding the fact that LCNI would change the name of its restaurant and replace any previous branded materials, but that agreement was never fleshed out with anything close to the level of detail that would be expected of a contract. LME is, therefore, entitled to summary judgment on the defense of waiver through an actual, enforceable settlement agreement.

2. Estoppel/Laches

LCNI's potential defenses based on laches and estoppel rely on the same basic facts that, it argued, might support a finding of waiver, but laches and estoppel do not depend on the existence of an enforceable contract. Rather, the defenses of estoppel and laches—which are often discussed, in the intellectual property context, in connection with the related concept of "acquiescence"[2]— arise out of conventional principles of equity.

---

[2] LME faults LCNI for failing to plead "acquiescence" as a separate defense. However, LME has not identified any aspect of such a defense that would not be encompassed by the defenses of estoppel, waiver, and/or laches, which LCNI did expressly plead.

21

Laches and estoppel, respectively, address very similar—but not identical—concerns. Laches is a "judicially created equitable doctrine" barring recovery of damages where the plaintiff's "negligent and unintentional failure to protect [its] rights" has harmed the defendant. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 232 (6th Cir. 2007) (quoting *United States v. Rodriguez–Aguirre*, 264 F.3d 1195, 1207–08 (10th Cir.2001); *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* at 231 (quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)). Equitable estoppel, in contrast, prevents a party from enforcing a right "when he has 'by his representations or his conduct induced the other party . . . to give him an advantage which it would be against equity and good conscience for him to assert.'" *Trustees of Mich. Laborers' Health Care Fund v. Gibbons*, 209 F.3d 587, 591 (6th Cir. 2000) (quoting *Union Mut. Ins. Co. v. Wilkinson*, 80 U.S. 222, 233 (1871). Each doctrine focuses on the harm to the defendant due to the actions of the plaintiff. The key distinction, however, is that laches requires no wrongdoing other than a lack of diligence, whereas estoppel requires some misleading statement or action by the plaintiff. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 684 (2014).

The court has little difficulty concluding that a reasonable jury could find either laches or estoppel here. When LME sent its initial cease-and-desist letter, LCNI could have simply disregarded its demands and invited LME to sue—which, given the weakness of LME's mark, might have been a winning strategy. Instead, LCNI, with LME's full knowledge and encouragement, voluntarily spent thousands of dollars and changed the entire branding of its restaurant in order to try to avoid an expensive lawsuit. Then, four years after LME first noticed

22

the alleged infringement and two years after it sent its first cease-and-desist letter, it sued anyway—despite its express assertions, in 2020, that it wished to avoid litigation. LME argues that its delay was not unreasonable, and it is possible that a jury would agree. It is possible, however, that it would not.

If LCNI had known the apparent truth—that even near-total capitulation on the trademark issue would not have prevented litigation—it presumably would not have unilaterally scrapped its name and branding at its own expense, with nothing to show for it. LME, however, let the matter lie unnecessarily dormant while LCNI made those expenditures based on its understanding that it could avoid litigation by doing so, only to then sue LCNI regardless. That pattern of actions plausibly fits into a defense of laches, estoppel, or acquiescence. The court, accordingly, will not grant LME summary judgment with regard to those defenses.

### 3. Defenses Related to the LA COSTA Mark

Finally, LME asks the court to award it summary judgment with regard to LCNI's purported Tenth and Eleventh Affirmative Defenses, which read as follows:

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff lacks standing to police infringement of the "La Costa" mark because there exists a senior user of the "La Costa" mark.

**ELEVENTH AFFIRMATIVE DEFENSE**

To the extent Plaintiff asserts rights in the "La Costa" mark, its mark is invalid because a senior user of the mark owns a valid, federal registration of the same.

(Doc. No. 19 at 3.) LME characterizes those defenses as an improper assertion of trademark rights in the LA COSTA mark, despite the fact that LCNI has not registered that mark, as would be required to file suit. *See* 15 U.S.C. § 1127. LCNI, however, has not asserted any actual

counterclaims for which it would need statutory authorization. It merely disputes the scope of LME's rights.

These supposed affirmative defenses do not appear to be very important. It does not appear, to the court, that LME *does* assert any rights to LA COSTA, other than by acknowledging the unremarkable fact that a mark using that phrase might, depending on various contextual factors, violate LME's marks containing it. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 283 (6th Cir. 1997) ("[C]ourts must view marks in their entirety and focus on their overall impressions, not individual features."). It is, therefore, not clear to the court that the Tenth or Eleventh Affirmative Defense is actually an affirmative defense applicable to this case at all.

At the same time, however, the extent of other parties' prior uses of LA COSTA is a genuinely relevant consideration in determining the strength of LME's mark, and the court will not foreclose discussion of that issue simply because it has been framed somewhat awkwardly in the Answer. The court, accordingly, will not grant summary judgment as to these potential defenses.

**D. LCNI's Requests for *Sua Sponte* Action**

LCNI asks the court not only to deny LME's request for summary judgment, but to take steps to grant summary judgment to LCNI *sua sponte* pursuant to Rule 56(f). LCNI explains, in its briefing, that it chose not to file its own summary judgment motion due to the expected cost of doing so. (*See* Doc. No. 41 at 2.) LCNI nevertheless asks the court to grant it summary judgment anyway, based on the issues addressed in connection with LME's motion.

While LCNI's concerns about the costs of litigation may be well-founded and understandable, the court cannot condone that strategy—which, in addition to being a departure

24

from the structure envisioned by the Rules, does not actually seem likely to be a very effective cost control measure. It is true that Rule 56(f) permits the court to award summary judgment to a nonmovant *sua sponte*, but only "[a]fter giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). Accordingly, while Rule 56(f) may effectively excuse a party from filing an *initial* motion, it does not free any party from the expense of fully briefing the issues related to summary judgment. Moreover, if a court does not take the rare step of relying on Rule 56(f)—which a party should not assume that a court will do—the party who did not seek summary judgment will find itself in the position of having to actually go to trial, which can be an expensive process in its own right. LCNI's approach, accordingly, is not one that the court would encourage or wish to reward in this instance. *See Sykes v. Donnellon*, No. 2:20-CV-10689, 2021 WL 5541795, at *3 (E.D. Mich. Aug. 31, 2021) (referring to that strategy as "improper"), *report and recommendation adopted*, No. 2:20-cv-10689-TGB-KGA, 2021 WL 5037950 (E.D. Mich. Oct. 29, 2021).

In any event, the court sees no basis for pursuing *sua sponte* summary judgment here. While LME's *prima facie* case is not so overwhelming that the court can take it out of the hands of a jury, it is certainly strong enough to proceed. Moreover, while LCNI has made plausible arguments regarding fraud on the USPTO, laches, and estoppel, all of those arguments involve drawing contestable inferences from the existing facts. The court, accordingly, sees no basis for relying on Rule 56(f)—or for taking the even further step of *sua sponte* ordering the cancellation of LME's trademark registration, which LCNI also requests.

## E. Motion in Limine

LME's Motion in Limine asks the court to prevent Onate, who was not disclosed as an expert witness, from offering opinion testimony regarding the expectations of diners, particularly Hispanic ones, when they see a reference to Nayarit in a restaurant's branding. In a Declaration

filed in connection with LCNI's opposition to LME's Motion for Summary Judgment, Onate states, "I am from Mexican heritage, and I believe most Hispanics would understand the restaurants' names as describing the style of their food—indicating they serve seafood prepared like that in Nayarit, Mexico." (Doc. No. 42-5 ¶ 21.) LME argues that that statement expresses a degree of knowledge of consumer expectations that Onate is not qualified to assert. LCNI responds that Onate is simply speaking from her ordinary experience as a layperson and restauranteur with a basic knowledge of the geography of Mexico.

The Federal Rules of Evidence envision two types of potentially admissible opinion testimony. If "[a] witness who is qualified . . . by knowledge, skill, experience, training, or education" is appropriately disclosed and recognized by the court as an expert, then that expert witness may offer opinions on an array of probative issues within his or her "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a)–(d). A lay witness, however, may offer opinion testimony as well, albeit within a significantly more circumscribed scope. Such lay testimony is permitted if it is otherwise admissible and is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

Insofar as Onate wishes to testify at trial regarding the expectations of "most Hispanics," LME's objection is well-founded. Any such statement would suggest a level of universality and precision that is not consistent with Onate's practical knowledge. Onate's experience may qualify her to speak regarding her own restaurant's clientele, but she has no foundation for offering an opinion regarding the majority of Hispanic customers generally. Insofar as anyone could offer such

an opinion, it would need to be an expert in marketing who could ground it in some reliable methodology.

 As long as Onate stays away from broad assertions about "most Hispanics," however, her anticipated testimony would likely be permissible. It does not take an expert, for example, to testify that a reference to a geographic region in a restaurant's name will likely be perceived by consumers as relevant to the restaurant's cuisine; nor does it take an expert to recognize that Nayarit is on a particular section of the Pacific coast that would be associated with particular ingredients, like shrimp. Moreover, LME has affirmatively put Onate's mindset regarding the naming of the defendants' restaurant at issue. She cannot discuss that matter without touching on her own understanding of how consumers would interpret the name, including whether it refers to a specific regional cuisine.

The court, accordingly, will grant LME's request, but only in part. Onate will not be permitted to testify definitively about the expectations of "most Hispanics." She can, however, testify regarding her experience of diners' expectations related to the use of geographic designations in restaurant names, as well as what she would understand a reference to Nayarit, in particular, to suggest in the culinary context.

## IV. CONCLUSION

For the foregoing reasons, LME's Partial Motion for Summary Judgment (Doc. No. 34) will be granted as to the defense of waiver by settlement and otherwise denied, and its Motion in Limine No. 1 (Doc. No. 48) will be granted as to any testimony by Jackie Onate about the expectations of "most Hispanics" and will otherwise be denied.

27

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge